UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAYAM TEHRANI,<br><br>    Plaintiff,<br><br>    v.<br><br>JOIE DE VIVRE HOSPITALITY, LLC, et al.,<br><br>    Defendants. | Case No. 19-cv-08168-EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION TO AMEND COMPLAINT**<br><br>Docket No. 90 |

Plaintiff Payam Tehrani has filed suit against Defendants DH Vitale Manager, LLC and SF Treat, LP, alleging that they violated a provision of the Telephone Consumer Protection Act ("TCPA") by using an "autodialer" to send three text messages to his cell phone. In an opinion issued in April 2021, *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), the Supreme Court gave guidance as to what constitutes an autodialer for purposes of the TCPA. The Court rejected the broad interpretation of autodialer that the Ninth Circuit had endorsed.

Mr. Tehrani now moves for leave to file a third amended complaint ("TAC"). Mr. Tehrani argues that, even though the *Facebook* Court took a narrower view (compared to the Ninth Circuit) of what an autodialer is, he can still plead facts in the instant case that satisfy the Supreme Court's definition of autodialer. Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **DENIES** Mr. Tehrani's motion.

### I.    FACTUAL & PROCEDURAL BACKGROUND

A.    Operative Complaint

The TCPA prohibits the use of an autodialer – also known as an automatic telephone dialing system – in certain circumstances. It provides in relevant part as follows:

> It shall be unlawful for any person . . .
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice –
>
> . . .
> (iii) to any telephone number assigned to a . . . cellular telephone service . . . or any other service for which the called party is charged for the call . . . .

47 U.S.C. § 227(b)(1)(A)(iii).

In the operative second amended complaint ("SAC"), Mr. Tehrani alleges that Defendants violated the above provision in the TCPA because, as a result of Defendants' actions, he "received 3 autodialed text messages to his cellular phone from Hotel Vitale" in September 2019. Compl. ¶ 14; *see also* Compl. ¶¶ 16-18 (referring to a text message received on September 7, 2019, and two messages received on September 8, 2019). According to Mr. Tehrani, "[a]lthough he once stayed at Hotel Vitale years ago, and may have provided his telephone number in connection with that stay, [he] has never provided Defendants with consent to send him autodialed text messages unrelated to that stay at Hotel Vitale years ago and/or marketing Hotel Vitale." Compl. ¶ 22.

B.  Supreme Court's *Facebook* Decision

As indicated above, the critical issue in the instant case is whether the text messages were, in fact, sent to Mr. Tehrani's cell phone through the use of an automatic telephone dialing system. "Automatic telephone dialing system" is defined in the TCPA as follows:

> equipment which has the capacity –
>
> (A) *to store or produce telephone numbers to be called, using a random or sequential number generator*; and
>
> (B) to dial such numbers.

47 U.S.C. § 227(a)(1) (emphasis added).

In *Facebook*, 141 S. Ct. at 1163, the Supreme Court addressed the issue of what constitutes an automatic telephone dialing system, or autodialer, for purposes of the TCPA. The plaintiff in *Facebook* alleged that Facebook had an autodialer for purposes of the TCPA because it (1) "maintain[ed] a database that stored phone numbers and [(2)] program[med] its equipment to send

automated text messages to those numbers each time the associated account was accessed by an unrecognized device or web browser." *Id.* at 1168. According to the plaintiff, the phrase "using a random or sequential number generator" modified only the verb closest to it – *i.e.*, "produce." In contrast, the defendant argued that the phrase modified both verbs that preceded it – *i.e.*, not only "produce" but also "store." *See id.* at 1169. The Supreme Court sided with the defendant: "To qualify as an 'automatic telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential generator or to produce a telephone number using a random or sequential number generator." *Id.* at 1167.

In support of the above conclusion, the Supreme Court noted as follows:

- "Under conventional rules of grammar, '[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.'" *Id.* at 1169; *see also id.* at 1170 (noting that the "Court has declined to apply the rule [of the last antecedent] where, like here, the modifying clause appears after an integrated list"; adding that, in any event, "[t]he last antecedent before 'using a random or sequential number generator' is not 'produce,' . . . but rather 'telephone numbers to be called'").

- The TCPA's restrictions on autodialers were meant to "target a unique type of telemarketing equipment that risks dialing emergency lines randomly or tying up all the sequentially numbered lines at a single entity. [¶] Expanding the definition of autodialer to encompass any equipment that merely stores and dials telephone numbers would take a chainsaw to these nuanced problems when Congress meant to use a scalpel." *Id.* at 1171. For example, a broad definition of autodialer "would capture virtually all modern cell phones, which have the capacity to 'store . . . telephone numbers to be called' and 'dial such numbers.'" *Id.*; *see also id.* at 1172 n.6 (rejecting plaintiff's argument that cell phones are not autodialers because they cannot dial phone numbers automatically and require human intervention; "all devices require some human intervention," and "[w]e decline to interpret the TCPA as requiring such a difficult line-drawing exercise around how much automation is

3

1 too much").

2 - Although, "as a matter of ordinary parlance, it is odd to say that a piece of
3 equipment 'stores' numbers using a random number 'generator[,]' . . . it is less odd
4 as a technical matter. . . . [A]s early as 1988, the U.S. Patent and Trademark Office
5 issued patents for devices that used a random number generator to store numbers to
6 be called later (as opposed to using a number generator for immediate dialing)." *Id.*
7 at 1171-72.

8 On the last point, the Supreme Court acknowledged, in a footnote, the plaintiff's argument
9 that a device that uses a random number generator to store numbers to be called later "would
10 necessarily 'produce' numbers using the same generator technology, meaning 'store or' in §
11 227(a)(1)(A) is superfluous." *Id.* at 1172 n.7. The Supreme Court rejected the argument, finding
12 no superfluidity

> for Congress to include both functions in the autodialer definition so
> as to clarify the domain of prohibited devices. *For instance, an*
> *autodialer might use a random number generator to determine the*
> *order in which to pick phone numbers from a preproduced list. It*
> *would then store those numbers to be dialed at a later time.* In any
> event, even if the storing and producing functions often merge,
> Congress may have "employed a belt and suspenders approach" in
> writing the statute.

18 *Id.* (emphasis added; citing, *inter alia*, amicus brief submitted by the Professional Association for
19 Customer Engagement).

20 C. Proposed TAC

21 According to Mr. Tehrani, the italicized language above from footnote 7 recognizes that
22 there is an autodialer in the following circumstance:

> [A] system uses a list of *preexisting phone numbers* (e.g., marketing
> contacts). It generates an *index number* using either a sequential
> number generator (e.g., 1001, 1002, 1003, etc.), or a random number
> generator, *assigns the generated numbers to phone numbers from*
> *the list*, and stores the information. The system can then select sets
> of numbers to automatically dial (e.g., calling numbers 1,001-
> 2,000).

4

| Number | Name of Lead | Phone number |
|---|---|---|
| . . . | . . . | . . . |
| 1001 | John Smith | 555-292-3885 |
| 1002 | Kathryn Johnson | 555-706-8392 |
| 1003 | Timony Weil | 555-389-1424 |
| 1004 | David Kelly | 555-195-8425 |
| 1005 | Samantha Caufield | 555-292-4829 |
| and so on . . . . | . . . | . . . |

Mot. at 4.  In other words, according to Mr. Tehrani, the number generator in the autodialing system (whether random or sequential) does not have to "*create* the phone numbers themselves." Mot. at 2 (italics in original); *see also* Mot. at 5 (contending that "the TCPA does not solely protect the public from autodialer devices that use number generators to create the phone numbers – the statute protects the public from autodialers that randomly or sequentially generate numbers 'to determine the order in which to pick phone numbers from a preproduced list' and 'then store those numbers to be dialed at a later time'").

Based on this autodialer theory, Mr. Tehrani asserts that an autodialer was used in his case, even though it is undisputed that the alleged autodialer used by Defendants did not have the capacity to generate random telephone numbers to call.  In his proposed TAC, Mr. Tehrani alleges as follows:

- To send text messages, "Defendants used TrustYou software."  Prop. TAC ¶ 14.
- "The TrustYou system includes [an existing] contacts database that can store names, phone numbers, and other information."  Prop. TAC ¶ 15.
- "The TrustYou system can generate sequential numbers and store these numbers in its customer database, *to index contacts*.  When a mass texting campaign is initiated, the system can then automatically text customers in the stored, sequential order.  In addition, or in the alternative, when a group of contacts is selected for a mass texting campaign, the system can generate sequential numbers to indicate the

5

texting order, store the selected contacts in this sequential order, and then text the contacts in the stored order." Compl. ¶ 17 (emphasis added).

## II. DISCUSSION

As noted above, "automatic telephone dialing system" is defined in the TCPA as follows:

equipment which has the capacity –

(A)  *to store or produce telephone numbers to be called, using a random or sequential number generator*; and

(C)  to dial such numbers.

47 U.S.C. § 227(a)(1) (emphasis added).

In addition, as noted above, Mr. Tehrani's position is that the "number generator" referred to above does not actually have to generate phone numbers. Rather, according to Mr. Tehrani, the "number generator" need only generate an *index* number which is then assigned to *preexisting* phone numbers:

> [A] system uses a list of *preexisting phone numbers* (e.g., marketing contacts). It generates an *index number* using either a sequential number generator (e.g., 1001, 1002, 1003, etc.), or a random number generator, *assigns the generated numbers to phone numbers from the list*, and stores the information. The system can then select sets of numbers to automatically dial (e.g., calling numbers 1,001-2,000).

Mot. at 4 (emphasis added).

The Court rejects Mr. Tehrani's position for multiple reasons.

First, as a textual matter, the "*number* generator" (whether random or sequential) specified in § 227(a)(1)(A) implicitly refers back to a "telephone number[]" – *i.e.*, the preceding phrase – and not to an index number. This implicit reference is confirmed by subsection (B) which refers to the capacity to *dial* "such numbers." Thus, throughout § 227(a)(1), the term "number[s]" refers to *telephone* numbers.

Second, as Defendants argue, the Supreme Court in *Facebook* addressed a split in circuit authority. The Supreme Court sided against not only the Ninth Circuit (which had held that "an ATDS need not be able to use a random or sequential number generator to store numbers – it suffices to merely have the capacity to 'store numbers to be called' and 'to dial such numbers

6

automatically,'" *Duguid v. Facebook*, 926 F.3d 1146, 1151 (9th Cir. 2019)) but also, *inter alia*, the Second Circuit. *See Duran v. La Boom Disco, Inc.*, 955 F.3d 279 (2d Cir. 2020). In *Duran*, the Second Circuit had agreed with the Ninth Circuit that "the mere fact that the programs 'store' the lists of numbers is enough to render them ATDSs." *Id.* at 284. The Second Circuit had also rejected the position that there is no autodialer if the system dials numbers from "*prepared lists – that is, from lists that had been generated and uploaded to the programs by humans*." *Id.* at 283 (emphasis added). Prepared lists are, in essence, pre-existing lists. In rejecting the Second and Ninth Circuit holdings, the Supreme Court implicitly rejected Mr. Tehrani's interpretation of *Facebook*.

The Supreme Court's apparent rejection of Mr. Tehrani's position may further be inferred from the circuit authority with which it agreed. That authority indicates that the number generator must in fact create *telephone* numbers. *See, e.g.*, *Glasser v. Hilton Grand Vacations Co.*, 948 F. 3d 1301, 1307-09 (11th Cir. 2020) (noting that, "[a]t the time of enactment, devices existed that could randomly or sequentially *create telephone numbers* and (1) make them available for immediate dialing or (2) make them available for later dialing"; adding that it was not until 2003 that the FCC "issued a new order that interpreted § 227 to extend to equipment that *merely dialed numbers 'from a database of numbers'* – that merely stored numbers and called them") (emphasis added); *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 460 (7th Cir. 2020) (noting that defendant's system "neither stores nor produces numbers using a random or sequential number generator; instead, it exclusively dials numbers stored in a customer database," and, therefore is not an autodialer for purposes of the TCPA).

Third, Mr. Tehrani's position makes little sense when one takes into account the harms that the TCPA was intended to address. As the Supreme Court noted in *Facebook*: at the time of the TCPA's enactment, autodialers had

> revolutionized telemarketing by allowing by allowing companies to dial random or sequential blocks of telephone numbers automatically. Congress found autodialer technology to be uniquely harmful. It threatened public safety by "seizing the telephone lines of public emergency services, dangerously preventing those lines from being utilized to receive calls from those needing emergency services." H. R. Rep. No. 102-317, p. 24

7

> (1991). Indeed, due to the sequential manner in which they could generate numbers, autodialers could simultaneously tie up all the lines of any business with sequentially numbered phone lines. Nor were individual consumers spared: Autodialers could reach cell phones, pagers, and unlisted numbers, inconveniencing consumers and imposing unwanted fees.

*Facebook*, 141 S. Ct. at 1167; *see also id.* at 1171 (indicating that there were "nuanced problems" that Congress intended to address; the TCPA "prohibitions target a unique type of telemarking equipment that risks dialing emergency lines randomly or tying up all the sequentially numbered lines at a single entity"). If these are the harms that the TCPA was intended to address, then little would be gained by finding a TCPA violation based on a preexisting customer database. For example, it is unlikely that a preexisting customer database would contain an emergency number; similarly, it is unlikely that a customer database would pose a danger to tying up business with sequentially numbered phone lines. In short, Mr. Tehrani has failed to identify a cognizable harm sought to be addressed by Congress which would result from a randomized *ordering* of phone calls to a defined customer list.[1]

In his papers, Mr. Tehrani argues that the legislative history weighs in his favor. But the history that he cites is not that informative, simply stating as follows:

> While some telemarketing businesses still rely on telephone directories, printed lists of prospective customers, and manual operations, the number of such businesses is dwindling. Today, computers assist an estimated 82 percent of Americas businesses conducting telemarketing campaigns. And computer assistance goes far beyond dialing the telephone number of the prospective customer and transferring the call to the next available telemarketing service representative. The entire sales to service marketing function has been automated. Modern telemarketing software organizes information on current and prospective clients into databases designed to support businesses in every aspect of telephone sales all with the objective of bringing the company's product or service to the customer most likely to purchase it.

Telephone Advertising Consumer Rights Act, 102 H. Rpt. 317 (Nov. 15, 1991). This is not an indication that Congress intended to outlaw any automated dialing system – a result Mr. Tehrani seems to advocate. Moreover, in *Facebook*, the Supreme Court explicitly noted that just because "Congress was broadly concerned about intrusive telemarketing practices . . . does not mean it

---

[1] For example, how would ranking telephone numbers to dial be more injurious if the ranking were random as opposed to, *e.g.*, sequential based on alphabetical order?

1    adopted a broad autodialer definition. Congress expressly found that the use of random or

2    sequential number generator technology caused unique problems for business, emergency, and

3    cellular lines." *Facebook*, 141 S. Ct. at 1172.

4    Fourth, Mr. Tehrani's reliance on footnote 7 of *Facebook* is unavailing. Footnote 7 reads

5    in its entirety as follows:

> Duguid argues that such a device would necessarily "produce" numbers using the same generator technology, meaning "store or" in §227(a)(1)(A) is superfluous. "It is no superfluity," however, for Congress to include both functions in the autodialer definition so as to clarify the domain of prohibited devices. For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a *preproduced list*. It would then store those numbers to be dialed at a later time. *See* Brief for Professional Association for Customer Engagement et al. as Amici Curiae 19. In any event, even if the storing and producing functions often merge, Congress may have "employed a belt and suspenders approach" in writing the statute.

*Id.* at 1172 n.7 (some citations omitted; emphasis added). According to Mr. Tehrani, a "preproduced list" could be, *e.g.*, a pre-existing customer database. As an initial matter, Mr. Tehrani's position is problematic based simply on the fact that the Supreme Court did not take a clear-cut stance, with its final sentence in the footnote reading: "In any event, *even if* the storing and producing functions often merge, Congress may have 'employed a belt and suspenders approach' in writing the statute." *Id.* at 1172 n.7 (emphasis added). However, even if the Court were to consider what the Supreme Court might have meant by "preproduced list," Mr. Tehrani would fare no better. The Supreme Court cited to an amicus brief (from an organization known as PACE) in making the statement above. That brief makes clear that the "preproduced list" was not some kind of pre-existing list but rather a list of phone numbers that was generated by a number generator:

> The '028 Patent [which was filed in 1986 and issued in 1988, *i.e.*, several years before the passage of the TCPA in 1991] describes a dialer that the TCPA was presumably intended to encompass. The '028 Patent describes a method of blending random and sequential number generator technologies to dial telephone numbers within a defined number range. The numbers would be initially dialed in a random manner, but then at a certain point any remaining undialed numbers are dialed in a sequential manner. *Specifically, the dialer first generates a sequence of telephone numbers within a specified*

> *range, which are stored into an array in memory.* Next, a random number is generated and used to point to one of the sequential telephone numbers in the array [i.e., one of sequenced numbers is selected randomly]. That telephone number from the array is produced to create a record that is either dialed immediately or stored in a file for later dialing. In either case, after the telephone number is selected, it is flagged in the array as having been selected. Then, the process is repeated wherein another random number is generated and used to produce another corresponding telephone number from the array. However, if that other telephone number is flagged as having been previously dialed, then no record is created and that number is neither dialed nor stored. Otherwise, the number is dialed immediately or stored for later dialing.").

2020 U.S. S. Ct. Briefs LEXIS 3743, at *19-20 (Sept. 10, 2020) (emphasis added); *see also id.* at *22 ("Consequently, a dialer implementing this technology could *use a sequential number generator for storing 10,000 telephone numbers in an array in RAM*. The dialer then uses a random number generator to produce the numbers (i.e., select, retrieve, and provide the number from memory) for immediate or subsequent dialing. The random number generator may also be involved in further storing the number (albeit in a different manner, i.e., in a file) for dialing at a later time.") (emphasis added).

Finally, the post-*Facebook* decisions that Mr. Tehrani cites do not clearly support his position – they simply indicate that discovery may be needed to determine whether the defendant uses an autodialer. *See, e.g.*, *Carl v. First Nat'l Bank of Omaha*, No. 2:19-cv-00504-GZS, 2021 U.S. Dist. LEXIS 111889, at *21 n.10 (D. Me. June 15, 2021) (stating that "*Duguid* suggested that an ATDS could potentially fall under TCPA if it 'use[s] a random number generator to determine the order in which to pick phone numbers from a preproduced list [and] then store[s] those numbers to be dialed at a later time'[;] while this description may encompass Defendant's VoicePortal system, the issue is not amenable to summary judgment on the current record"); *see also Jance v. Homerun Offer, LLC*, No. CV-20-00482-TUC-JGZ, 2021 U.S. Dist. LEXIS 143145, at *9 (D. Ariz. July 30, 2021) (noting that that whether defendant has an ATDS is often a fact exclusively within the defendant's possession); *Atkinson v. Pro Custom Solar LCC*, No. SA-21-CV-178-OLG, 2021 U.S. Dist. LEXIS 112396, at *3 (W.D. Tex. June 16, 2021) (noting the same). But here there is no dispute about the process that Defendants use to text customers (*i.e.*, no discovery is needed). The vast majority of cases issued after *Facebook* reject Mr. Tehrani's

position. *See, e.g.*:

- *Hufnus v. Donotpay, Inc.*, No. 20-cv-08701-VC, 2021 U.S. Dist. LEXIS 118325, at *3-4 (N.D. Cal. June 24, 2021) (finding that plaintiff's "reading of footnote 7 conflicts with *Duguid*'s holding and rationale[;] [t]he Supreme Court explained in *Duguid* that the TCPA's definition of autodialer concerns devices that allow companies 'to dial random or sequential blocks of telephone numbers automatically,' not systems, such as DoNot Pay's, that randomly or sequentially dial numbers from a list that was itself created in a non-random, non-sequential way").

- *Watts v. Emergency Twenty Four, Inc.*, No. 20-cv-1820, 2021 U.S. Dist. LEXIS 115053, at *8-9 (N.D. Ill. June 21, 2021) (concluding that plaintiff had not alleged the use of an autodialer; "the alleged facts suggest that instead of randomly or sequentially generating Watts's number, EMERgency24's equipment stored Watts's number in a database and dialed that stored number because he was an employee at a business that used EMERgency24's alarm notification system").

- *Barry v. Ally Fin., Inc.*, No. 20-12378, 2021 U.S. Dist. LEXIS 129573, at *17-19 (E.D. Mich. July 13, 2021) (stating that "Plaintiff takes footnote 7 out of context"; "the 'preproduced list' of phone numbers referenced in the footnote was itself created through a random or sequential number generator").

- *Borden v. efinancial, LLC*, No. C19-1430JLR, 2021 U.S. Dist. LEXIS 153086, at *14-16 (W.D. Wash. Aug. 13, 2021) (stating that "Mr. Borden's argument relies on a selective reading of one line within footnote 7 and ignores the greater context of that footnote and the opinion").

- *Timms v. USAA Fed. Sav. Bank*, No. 3:18-cv-01495-SAL, 2021 U.S. Dist. LEXIS 108083, at *17 (D.S.C. June 9, 2021) (holding that "footnote 7 does not support Plaintiff's argument"; "the Supreme Court's statement – that an 'autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list' and 'then store those numbers to be dialed at a

11


later time' – refers to the process as explained by PACE on page 19 of its amicus brief").

The Court finds the result reached by a clear majority of courts is persuasive.

### III.  CONCLUSION

For the foregoing reasons, the motion to amend is denied.

Because the Court rejects Mr. Tehrani's interpretation of autodialer, it orders the parties to meet and confer to discuss how this litigation should now proceed – *e.g.*, should Defendants formally move for judgment (whether through a summary judgment or some other vehicle) or can the parties stipulate to a judgment based on the Court's interpretation (preserving for Mr. Tehrani the right to appeal)?  The parties are ordered to report back on their meet-and-confer efforts within a week of the date of this order.

This order disposes of Docket No. 90.

**IT IS SO ORDERED**.

Dated: August 31, 2021

_____
EDWARD M. CHEN
United States District Judge